IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANDREW LEONARD,                    )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )    No. 05 C 5647
                                   )
UHLICH CHILDREN'S ADVANTAGE        )
NETWORK AND DARLENE SOWELL,        )
                                   )
        Defendants.                )
                                   )
                                   )

MEMORANDUM OPINION AND ORDER

Plaintiff Andrew Leonard filed a three count complaint against defendants Uhlich Children's Advantage Network ("UCAN") and Darlene Sowell, Vice President of Human Resources at UCAN. Count I alleges a claim for interference under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.,* against both defendants. Counts II and III, against UCAN only, allege violations of the Americans with Disability Act ("ADA") and retaliatory constructive discharge under the FMLA and ADA. Plaintiff has moved for summary judgment on Count I and defendants have moved for summary judgment on all counts. For the following reasons, the defendants' motion is granted in part and denied in part, and plaintiff's motion is denied.

I.

UCAN provides mental health treatment for children who are wards of the State of Illinois. Leonard was initially hired by

UCAN as a Residential Treatment Specialist on December 1, 2003; his duties as such included counseling children. In the fall of 2004, Leonard was promoted to Residential Case Manager I. In addition to counseling, his new duties included acting as a liaison and advocate for children before the courts, schools, and Illinois Department of Children and Family Services, as well as taking children to home visits, supervising home visits, and drafting quarterly reports. His immediate supervisors were Marvin Harris and Josephine Abi Rashed.

Leonard first became absent from work due to illness on Monday November 29, 2004. Leonard called Harris that day and told him he was not feeling well and that he felt he needed some help.[1] Leonard was absent again the next day and again called Harris. Leonard told Harris "there's a lot of stuff in my head right now that I don't understand." (Leonard Dep. at 39.) Leonard also told Harris that he was struggling with the fact that his ex-wife had committed suicide (approximately two weeks after their divorce) and that he "couldn't get it out of [his] head and [] was reliving the events." (Id. at 42.) Leonard told Harris he needed help and was going to try to see his doctor. (Id.) Leonard was absent the rest of the week, and called and spoke with Harris every day during the first week of his absence. (Id. at 44-45.) He was not able to see

---

[1]Abi Rashed, Leonard's other supervisor, was on leave during this period.

his doctor until Friday December 3, 2004. His doctor believed Leonard had bipolar disorder, but recommended he see a psychiatrist. (Id. at 52-53.) That same day Leonard called Harris and relayed his doctor's tentative diagnosis. (Id. at 55.) Leonard called Harris again on Monday, December 6, 2004. He informed Leonard that he had spent the day in an emergency room, only to find out that they did not take his insurance. He told him he felt "[t]hings were getting worse." (Id. at 57.)

On or about December 9, 2004, Leonard was admitted into the University of Illinois at Chicago Hospital. He was not released until December 14, 2004. During his hospital stay, Leonard was diagnosed with bipolar disorder. Leonard recalls it was very difficult to make phone calls from the hospital, but he managed to leave messages for Harris during his hospital stay and to actually speak with Harris. Leonard also asked his psychiatrist to call UCAN and update them on his medical condition. On December 10, 2004, Leonard's psychiatrist, Dr. Khan, called Harris, who in turn directed her to call Sowell, the Vice President of Human Resources at UCAN. The same day Sowell received a telephone call from Dr. Khan informing her that Leonard was under Dr. Khan's care as an inpatient and that he should be out of the hospital by the end of the weekend (December 12) and back to work the following Tuesday or Wednesday (December 14 or 15). Dr. Khan also sent Sowell a confirmatory fax on that same date. Also during Leonard's stay at

the hospital, specifically on December 13, 2004, Catherine Ellis, Leonard's sister, left a voice mail message for Sowell, which stated that she was calling on behalf of her brother. Ellis reported that Leonard was in the hospital and that he needed a medical leave. She specifically asked whether there were any FMLA forms that needed to be filled out and said she wanted to make sure that Sowell was aware of Leonard's situation. On December 14, 2004, Ellis left another voice mail message for Sowell. She stated she wanted to talk to Sowell about her brother's "medical leave since he is not in a position to do so himself." Sowell did not return these calls. Leonard was released from the hospital on December 14.

On December 20, 2004, Sowell spoke with Leonard and told him he needed to have his doctor fill out FMLA paperwork. Leonard informed Sowell that he would not be able to see his doctor until January 9 or 10, 2005. On December 21, 2004, Leonard filled out FMLA paperwork that had been faxed to him by Sowell. He wrote on the form that he would be back to work by December 27, 2004. Leonard did not appear for work on December 27. At the time Leonard believed he had called UCAN to inform them that he needed to extend his leave. Leonard does recall speaking with his sister on that date and telling her that he had called UCAN to extend his leave. Leonard's telephone records indicate the call to UCAN never took place.

On December 31, 2004, Leonard received a letter, via Federal Express, informing him that he had resigned from his employment because he had been absent from work and had not called for three days.  Leonard could not contact anybody at UCAN that day because it was a holiday, but left messages for Harris and Sowell on Sunday January 2, 2005 stating that he had not resigned.  He hoped that way they would hear the messages "the very first second they walked in the office, the very next business day."  (Id. at 124.)  On January 3, 2005, Sowell returned Leonard's call, and he told her he did not intend to resign and that he wanted to continue his employment with UCAN.  He also told Sowell he believed he had called UCAN to inform them that he needed to extend his leave.  Sowell refused and told him he should reapply when he was feeling better.  Also on January 3, 2005, Sowell received two voice mail messages from Ellis stating that Leonard had in fact called in on December 27 to say he needed to continue on medical leave and requesting Sowell call her back.  Sowell did not return the calls.  This lawsuit was subsequently filed.

On or about November 2005, UCAN approached plaintiff about returning to work in connection with the "Service Connector" project.  The project required some of the residents from certain public housing development, such as Cabrini Green, Altgeld Gardens, Lowden, and Trumbull, to relocate to new housing developments and to receive UCAN counseling services.  Plaintiff told UCAN he did

not want to work at Cabrini Green, but was offered a position which specifically involved working at Cabrini Green. Leonard accepted the offer and was re-hired as a Residential Case Manager I, with the same salary of $30,000 annually. Although plaintiff was hired as a new employee, plaintiff's counsel requested UCAN waive the one year service requirement to be covered under UCAN's FMLA policy and UCAN agreed.

On May 24, 2006, Leonard provided his resignation letter, citing personal safety, unequal treatment, and that the job was "hindering progress with [his] illness" as the reasons for his resignation. His resignation was to be effective June 2, 2006. Leonard subsequently amended his complaint to include Count III, his retaliatory constructive discharge claim.

## II.

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 502 (7th Cir. 2004); FED. R. CIV. P. 56(c). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

A. Count I

Under the FMLA, eligible employees are entitled to twelve weeks unpaid leave per year for various reasons, including a "serious health condition" rendering the employee unable to perform her job. *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). Leave may be taken continuously or on an intermittent basis. 29 U.S.C. § 2612(b). The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). "In addition to the substantive guarantees contemplated by the Act, the FMLA also affords employees protection in the event they are discriminated against for exercising their rights under the Act." *King v. Preferred Tech. Group*, 166 F.3d 887, 891 (7th Cir. 1999) (citing 29 U.S.C. § 2615(a)(1) & (2)). Count I alleges defendants interfered with Leonard's rights under the FMLA in violation of 29 U.S.C. § 2615(a)(1) for terminating his employment in December 2004.

In order to succeed on a FMLA interference claim, a plaintiff must establish: (1) that he was eligible for the FMLA's protections; (2) his employer was covered by the FMLA; (3) he was entitled to leave under the FMLA; (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled. *Burnett v. LFW, Inc.*, 472 F.3d

471, 477 (7th Cir. 2006). The parties' dispute here centers on the notice prong.

"The notice requirements of the FMLA are not onerous." *Id*. at 478. "The employee's notice obligation is satisfied so long as he provides information sufficient to show that he *likely* has an FMLA-qualifying condition." *Id*. at 479 (emphasis in original). Generally, an employee is expected to give 30 days advance notice to the employer, stating the reasons for the leave and the expected timing and duration of the leave. *See* 29 C.F.R. § 825.302(a)-(c). However, it is recognized that such advance notice is not always possible due to emergency or unforseen circumstances, in which case adequate notice must be given "as soon as practicable." 29 C.F.R. § 825.302(b). "[A]n employee may be excused from expressing a need for medical leave in at least two exceptional situations–when circumstances provide the employer with sufficient notice of the need for medical leave or when the employee is incapable of providing such notice." *Burnett*, 472 F.3d at 479 (citing *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381-82 (7th Cir. 2003)).

Here, the record indicates there are material issues of fact concerning (1) whether notice was feasible in the relevant time period, i.e. whether Leonard was able to give notice on December 27-30 in light of his medical condition, *see, e.g., Byrne*, 328 F.3d at 382 (employee may be excused from giving notice when suffered from clinical depression and his medical condition prevented him

from communicating the nature of his illness and need for leave);
and (2) whether UCAN was on notice that leave should have been
extended in light of plaintiff's illness, hospitalization, and
previous conduct. While a number of facts may weigh in Leonard's
favor, such as his previous track record of consistently calling
his employer throughout the remainder of his absence or the nature
of his illness and medication, this is ultimately a credibility
determination for the trier of fact. *See Burnett*, 472 F.3d at 479
("adequacy of notice is a fact-specific question"). Plaintiff has
not submitted irrefutable medical evidence that Leonard was unable
to give notice, nor has defendant presented any evidence that
Leonard intentionally failed to give notice. Accordingly, summary
judgement is inappropriate for Count I.

## B. Count II

Count II alleges UCAN violated the ADA when it terminated
Leonard in 2005. Plaintiff claims UCAN discriminated against him
and failed to accommodate his disability. To establish disability
discrimination, Leonard must proceed under either the direct or
indirect method of proof. *Buie,* 366 F.3d at 503. Under the direct
method, plaintiff must show (1) he is disabled within the meaning
of the ADA; (2) he is qualified to perform the essential functions
of the job, either with or without a reasonable accommodation; and
(3) that he suffered from an adverse employment action because of
his disability. *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638,

641 (7th Cir. 2005). Leonard has no direct evidence that UCAN's actions were based upon the prohibited animus, and therefore must present circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (citations omitted). Under the indirect method, Leonard must make a *prima facie* case of discrimination by showing (1) he is disabled within the meaning of the ADA; (2) he was meeting his employer's expectations; (3) he was subject to an adverse employment action; and (4) similarly situated employees received more favorable treatment. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007). UCAN first moves for summary judgment on the ground that Leonard cannot show he is disabled within the meaning of the ADA.

Under the first element of a *prima facie* disability claim, i.e. whether the plaintiff is disabled within the meaning of the ADA, courts consider "the nature and severity of the impairment, the duration and expected duration of the impairment, and the permanent or long term impact of or resulting from the impairment." *Id.* (quotations omitted) An individual is considered to have a disability under the ADA if (1) he has an impairment that substantially limits one or more of his major life activities; (2) he has a record of such an impairment; or (3) his employer regards him as having such an impairment. *Id.* (citation omitted).

Defendant argues Leonard has not shown he was substantially limited in a major life activity as a result of suffering from bipolar disorder. In support, defendant points to Leonard's testimony that he was able to function prior to his diagnosis in November 2004 and that his condition is generally stabilized by medication. Leonard disagrees, claiming his condition interferes with his sleeping, eating, concentration, and caring for his own basic needs, such as grooming. In support, he relies on the nature of bipolar disorder, his own testimony and subsequent declaration, excerpts from one of his physician's testimony, and medical records.

Viewing the evidence and all reasonable inferences in the light most favorable to Leonard, there is a genuine issue of material fact as to whether Leonard was substantially limited in a major life activity, and therefore disabled within the meaning of the ADA. While bipolar disorder is certainly a serious condition, the Seventh Circuit has made clear that "whether or not a medical condition rises to the level of a disability is to be made on an individualized case-by-case basis." *Id.* at 938 (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999)). Therefore, the evidence concerning the general nature of bipolar disorder, either from medical literature or witness testimony, is not controlling of this particular inquiry. Instead, I must consider the evidence of Leonard's specific condition and treatment.

Although Leonard and his physician testified his condition is generally stabilized by medication, Leonard's medical records and deposition testimony indicate that he suffered from bouts of depression that specifically interfered with some of his basic life activities. A medical record dated February 8, 2005 states that, even after his hospitalization and medication, plaintiff experienced "continued difficulty engaging in daily activities and staying out of bed." Leonard described having difficulty with basic activities such as grooming himself and taking out the trash. With respect to sleep, Leonard's testimony, subsequent declaration and medical records set forth that he experienced difficulty sleeping and could only sleep 3-5 hours a night. His sleeping problems are documented in the medical records as spanning for at least several weeks. Accordingly, I find a triable issue exists with respect to plaintiff's disabled status.

Next, UCAN moves for summary judgment on the ground that Leonard cannot establish UCAN's termination of Leonard's employment was based on his disability.[2] At the outset, I must note that plaintiff has not presented any evidence of similarly situated individuals who received more favorable treatment. Nor has he

---

[2]Although UCAN also initially appeared to dispute that Leonard was not qualified to perform the essential functions of his employment in its opening brief (Def. Op. Br. at 8), it withdraws such argument in its reply brief, taking issue only with Leonard's classification as disabled under the ADA and whether he was terminated as a result of his disability. (Def. Rep. Br. at 7.)

argued the existence of any such similarly situated individuals in his briefs. Accordingly, Leonard must proceed under the direct method of proof in order to defeat summary judgment. *See id.*

Leonard relies on the following circumstantial evidence to argue against summary judgment. Plaintiff first points to Sowell's failure to return Ellis' phone calls concerning Leonard's need for leave. He claims this is in violation of UCAN's own policy which allows employees to have a family representative contact UCAN concerning the employee's absence. The problem with this evidence is that Ellis did not make any telephone calls to UCAN during the relevant period between December 27-30; therefore UCAN did not ignore any of Ellis' calls when deciding to terminate Leonard. In fact, Ellis' calls took place December 10, 14 and January 3. Leonard contacted UCAN and Sowell directly, concerning his absence, on December 20 and on January 2 and 3. Therefore, even when taken in the best light to plaintiff, the fact that Sowell did not return Ellis' telephone calls is inconsequential to Leonard's termination.

Second, plaintiff claims the fact that Leonard's notice of termination was sent by Federal Express exhibits discriminatory intent because it meant that Leonard would not be able to speak with anyone at UCAN when he received the letter on December 31, 2004. I disagree. Based on Leonard's own representations, he was expected back at work on December 27. Three days later he was terminated for violating UCAN's three day no call-no show policy.

13

The timing of the letter is simply consistent with UCAN's policy. Plaintiff also argues that UCAN's position that it was not aware of Leonard's disability because it did not receive any additional medical records other than the December 10 fax from Dr. Khan, which provided he would return to work within days, is untenable in light of the information available to UCAN. Even assuming plaintiff is correct on this point, this is not evidence of discriminatory intent. To the contrary, Leonard was not terminated upon UCAN receiving the medical information concerning his condition; he was terminated only after missing three consecutive days of work without contacting his employer. This actually corroborates UCAN's position.

Finally, plaintiff also points to Harris' consistent practice of contacting employees who missed work and did not call. This raises the question of why he did not call Leonard. Harris testified at his deposition that it is his practice to call employees that are absent and do not call in. Harris testified that he was aware that Leonard was expected back at work on December 27 and he did not show on that date. He also testified he was generally aware of Leonard's medical condition and that he did not call him to inquire as to his absence. Harris said he did not do so because Sowell had been handling the matter in light of Leonard's extended absence and need for leave. However, Harris also testified that it was he who called the meeting with Sowell to

discuss Leonard's three day absence. That meeting resulted in Leonard's termination. In light of this evidence, I believe there is a genuine issue of material fact and summary judgment is inappropriate.

Plaintiff also claims UCAN violated the ADA by failing to accommodate his disability when he was terminated for violating the three day no call-no show policy. Denying reasonable requests for medical leave may constitute a violation of the ADA. *See Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 601 (7th Cir. 1998); *see also Byrne*, 328 F.3d at 381. "The language of the ADA itself demonstrates that a reasonable accommodation is connected to what the employer knows about the specific limitations affecting an employee who is a qualified individual with a disability." *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005). The federal regulations implementing the ADA provide:

> To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3); *see also Jackson*, 414 F.3d at 813. An employee must first inform his employer of his disability. *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998).

In this case, plaintiff claims UCAN did not engage in the "interactive process" by failing to accommodate Leonard's need for an extended leave.  In support, he cites *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281 (7th Cir. 1996) (defendant "tried to take hasty advantage of what it saw as an opportunity to rid itself of problem, a disabled employee").  Defendant makes no effort to distinguish *Bultemeyer* and I find a genuine issue of material fact exists concerning the extent to which UCAN was on notice, for ADA purposes, that Leonard's disability required he be granted an extended absence and whether UCAN failed to accommodate Leonard. Accordingly, summary judgment is inappropriate.

### C.  Count III

Count III is a claim for discriminatory and retaliatory constructive discharge for Leonard's 2006 resignation from UCAN. The complaint brings this claim under the FMLA and ADA.[3]  The complaint alleges retaliatory discharge under both discrimination/retaliation and interference/entitlement theories. The Seventh Circuit has explained "the difference is that the first type of claim requires proof of discriminatory or retaliatory

---

[3]Although the Seventh Circuit has not decided whether a claim of constructive discharge is cognizable under the FMLA, UCAN does not dispute or raise this issue.  At least one court from a neighboring district has found the claim is cognizable. *See, e.g., Traylor v. GTE North Inc.,* No. 1:04-CV-00445, 2005 WL 3210613, at *2 (N.D. Ind. Apr. 13, 2005).  At least one other circuit has recognized a constructive discharge claim under the FMLA. *See, e.g., Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005).

intent while the latter requires only proof that the employer denied the employee his or her entitlements under the Act." *Kauffman*, 426 F.3d at 884-54 (citations omitted).

Claims of discriminatory/retaliatory discharge under the FMLA are analyzed in the same manner as retaliatory discharge claims under other employment statutes, such as Title VII and the ADA. *See Buie,* 366 F.3d at 503; *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 440 (7th Cir. 2000). Accordingly, Leonard must proceed under either the direct or indirect method of proof. *Buie,* 366 F.3d at 503. Under either method, plaintiff must present evidence that he suffered an adverse employment action or an adverse action from the employer. *See, e.g., Williams v. Waste Mgmt. of Illinois, Inc*., 361 F.3d 1021, 1031-32 (7th Cir. 2004). In order to make this showing, Leonard argues his resignation from UCAN in 2006 was a constructive discharge.

"Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004) (citation omitted) (examining constructive discharge in Title VII context). To establish a claim of discriminatory constructive discharge, plaintiff must show: (1) his working conditions were made so intolerable that a reasonable person in his position would be forced to resign; and (2) that the intolerable working

conditions occurred as a result of plaintiff taking FMLA leave. *See Sears, Roebuck & Co.*, 233 F.3d at 440 (examining constructive discharge in ADA context). Overall, this is an objective inquiry. *See Penn. State Police*, 542 U.S. at 134. This requires a higher showing than hostile work environment under Title VII. *Id.*; *see also Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) ("unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

In this case, Leonard complains the following conditions made his work intolerable: (1) he was not paid at the same rate for which the job was advertised on the internet for new employees or other similarly situated employees; (2) he felt the head of his employer "physically shunned" him; (3) plaintiff ran into problems with his electronic paychecks on two separate occasions; (4) UCAN failed to respond to his workplace safety concerns; (5) during settlement negotiations, plaintiff felt defendant made clear that it did not want plaintiff working for UCAN. The only evidence provided by plaintiff in support of these allegations is his own deposition testimony.

Upon a review of the record, plaintiff's claim unravels. First, there is no evidence in the record that any similarly situated employee was paid more than Leonard. Moreover, defendant submits that the internet posting that plaintiff refers to was an

error, and in fact no employee was paid at the rate advertised. Leonard presents no evidence to the contrary. Second, the incidents of "physical shunning" that Leonard refers to are an instance in which Tom Vandenberg, the head of UCAN, did not take the same elevator despite the fact that Leonard held the elevator door open, and another instance when Vandenberg scowled and turned his back at him. (Leonard Dep. at 212-13.) Third, plaintiff's first electronic paycheck failed to deposit at his bank because of some kind of problem with his routing number, not because UCAN failed to issue payment. In fact, this problem was subsequently corrected and did not reoccur. On the second occasion that he ran into problems with his electronic paychecks he had been out on FMLA leave and was delayed in getting paid – but never denied any pay. Fourth, plaintiff complained that working at Cabrini Green was unsafe and that on occasion he was harassed by residents, some of whom had weapons. (Id. at 183-85.) There is no evidence, however, that Leonard was the only person exposed to such safety issues or that UCAN addressed other employees' security concerns meanwhile neglecting Leonard's. In fact, Leonard specifically testified another UCAN employee had experienced a threatening situation with a resident. (Id. at 185-86.) Moreover, UCAN policy was that employees could request co-workers accompany them on visits if they felt unsafe working alone. Leonard never requested such assistance; instead his attorney requested plaintiff be supplied

with a cellular telephone or other communication device.  Leonard does not explain, however, why this would be superior to being accompanied by another individual.  Fifth, during settlement negotiations with the Magistrate Judge, the Magistrate Judge allegedly told Leonard UCAN did not want him working there any more while none of the UCAN attorneys or representatives were in the room.

Even taken in the best light to plaintiff, the record fails to create a triable issue with regard to UCAN's conduct.  There is no evidence that UCAN's conduct rose to the level that would be required to maintain a constructive discharge claim.  *See Williams*, 361 F.3d at 1032-34; *Sears, Roebuck & Co.*, 233 F.3d at 441.  In this case, Leonard specifically accepted the position at Cabrini Green, he was not deceived or transferred into this position after accepting employment.  Many of the alleged instances of discrimination or intolerable circumstances identified by Leonard were the result of Leonard's incorrect beliefs.  For example, Leonard incorrectly believed he was being paid less than similarly situated employees, when in fact the colleagues he identified as receiving higher pay were in a higher pay grade as a result of their qualifications.  Even assuming its admissibility, the statement by the Magistrate Judge during settlement negotiations does not amount to any type of threat or directive by UCAN. Plaintiff testified that no UCAN employee ever told him they wanted

him to leave. (Leonard Dep. at 223.) Moreover, it is unclear from the record that resignation was Leonard's only option; he never requested a transfer to another unit, for example. *See Sears, Roebuck & Co.*, 233 F.3d at 441.

Similarly, Leonard's interference claims runs into problems, for there is no evidence that UCAN interfered with his FMLA rights. There is no evidence that Leonard was constructively discharged. Plaintiff was never denied FMLA leave upon his re-hiring. None of the alleged remarks or incidents are directed at his medical condition. Overall, there is no genuine issue of material fact that precludes summary judgment for defendant on Count III.

### III.

For the foregoing reasons, the parties' motions for summary judgment on Count I are denied; defendants' motion for summary judgment on Count II is denied; and defendants' motion for summary judgment on Count III is granted.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: April 12, 2007